IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| RESURRECTION BAY CONSERVATION ALLIANCE, et al.,<br><br>    Plaintiffs,<br><br>vs.<br><br>CITY OF SEWARD, ALASKA,<br><br>    Defendant. | Case No. 3:06-cv-0224-RRB<br><br>**ORDER RE CROSS-MOTIONS<br>FOR SUMMARY JUDGMENT** |

**I. INTRODUCTION**

Before the Court are Plaintiffs Resurrection Bay Conservation Alliance ("RBCA") and Alaska Community Action on Toxics ("ACAT") (collectively "Plaintiffs") and Defendant City of Seward, Alaska ("City") with cross motions for summary judgment at Docket 23 and Docket 25, respectively.

Plaintiffs argue that the City illegally discharges polluted storm water into waters of the United States in violation of the Clean Water Act ("CWA" or the "Act").[1] Plaintiffs seek an order requiring the City to apply for a National Pollution

---

    [1]    33 U.S.C. § 1251 et seq.

Discharge Elimination System ("NPDES") permit, an injunction against further discharges until the NPDES permit is obtained, and civil fines. The City denies that it operates industrial facilities subject to the Act and asserts that there are no discharges as alleged.

The Court heard oral argument on November 20, 2007. Based on the motions, supplemental briefing, and oral arguments, the Court concludes, for the reasons set forth below, that Plaintiffs have standing to sue under the citizen enforcement provisions of the CWA and that the City must apply for an NPDES permit, but that civil penalties are not appropriate.

**II. BACKGROUND**

Section 301(a) of the CWA prohibits discharges of pollutants into waters of the United States, unless the discharges are authorized by permit.[2] The CWA requires a permit for "discharge[s] associated with industrial activity."[3] A storm water discharge associated with industrial activity is defined as a "discharge from any conveyance" that is related to industrial activity at a facility.[4] This definition is purposefully broad.[5]

---

[2] 33 U.S.C. §§ 1311(a), 1342.

[3] 33 U.S.C. § 1342(p)(2)(B); 40 C.F.R § 122.26(a)(ii).

[4] 40 C.F.R § 122.26(b)(14).

[5] Natural Res. Def. Council v. EPA, 966 F.2d 1292, 1304 (9th Cir. 1992).

ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT - 2
3:06-CV-0224-RRB

Unlike traditional CWA point source discharges, "it is not necessary that storm water be contaminated or come into direct contact with pollutants; only association with any type of industrial activity is necessary."[6]

The EPA has promulgated regulations setting forth the NPDES permit application requirements for storm water discharges.[7] These regulations require each person with a point source of "storm water discharge associated with industrial activity" to apply for an individual permit, apply for a permit through a group application, or seek coverage under a promulgated storm water general permit.[8]

Plaintiffs allege that the City illegally discharges pollutants without a NPDES permit at two locations: the Seward Small Boat Harbor ("Small Boat Harbor") on the northwest shore of Resurrection Bay and the Boat Storage Area at Mile 7 Nash Road ("Boat Storage Area").

### III. SUMMARY JUDGMENT

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

---

[6] Id.

[7] See 40 C.F.R. § 122.26.

[8] 33 U.S.C. § 1324(p)(2)(B); 40 C.F.R § 122.26(a)(ii).

ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT - 3
3:06-CV-0224-RRB

Case 3:06-cv-00224-RRB   Document 66   Filed 02/21/08   Page 3 of 19

issue of material fact and that the moving party is entitled to judgment as a matter of law."[9] The moving party has the burden of showing that material facts are not genuinely disputed.[10] The moving party is not required to present evidence, but should identify areas where there is a lack of any genuine dispute as to material fact.[11]

Once the moving party meets its burden, the nonmoving party must demonstrate that a genuine issue of fact exists by presenting evidence indicating that certain facts are disputed so that a fact finder must resolve the dispute at trial.[12] There is no genuine issue of material fact when the relevant facts, "taken as a whole, indicate[] that a reasonable fact-finder could not find for the nonmoving party."[13]

**IV. DISCUSSION**

The parties stated at oral argument that the Court has all the information necessary to enter judgment on the merits. Other than disagreeing about whether the storm water discharges contain contaminants, the parties do not appear to be in

---

[9] Fed. R. Civ. P. 56(c).

[10] Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

[11] Id. at 323-325.

[12] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

[13] Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

disagreement as to the material facts underlying this matter.  The issues before the Court are therefore entirely legal.  Accordingly, the Court rules as follows:

**A.    Plaintiffs Have Standing**

The citizen enforcement provisions of the CWA authorize any person having an interest which may be affected to commence a civil action on his or her own behalf against any person violating Section 301(g) of the CWA.[14]  While "[t]he citizen suit provision of the Clean Water Act ("CWA") 'extends standing to the outer boundaries set by the "case or controversy" requirement of Article III of the Constitution'",[15] standing is not so broad a concept that anyone can bring such an action.  In order to satisfy Article III standing requirements for a CWA citizen enforcement action, a plaintiff must establish that "(1) it has suffered 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely . . . that the injury will be redressed by a favorable decision."[16] "An association . . . 'has standing to bring suit on behalf of its

---

[14]    See 33 U.S.C. §§ 1362(5), 1365(a)(1), (f), (g).

[15]    Ecological Rights Found. v. Pacific Lumber Co., 230 F.3d 1141, 1147 (9th Cir. 2000).

[16]    Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc., 528 U.S. 167 (2000); see also Natural Res. Def. Council v. Sw. Marine, Inc., 236 F.3d 985 (9th Cir. 2000), cert. denied sub nom. Sw. Marine v. San Diego Bay Keeper, 533 U.S. 902 (2001).

members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."[17]

Plaintiffs have made a minimal but sufficient showing of standing. In support of their argument that Plaintiffs have suffered injury in fact, Plaintiffs submit declarations from various ACAT and RBCA members, including ACAT Executive Director Pamela Miller, RBCA President Mark Luttrell, RBCA board member and ACAT member Russell Maddox, and RBCA/ACAT member Carol Griswold (collectively "Declarants"), who have visited Resurrection Bay and its beaches, Spring Creek, and Fourth of July Creek, as often as five times a month over the past 20 years.[18] Declarants use these areas along with their families, children, and pets, for a variety of recreational and aesthetic pursuits, including kayaking, walking, camping, fishing, wildlife viewing, and education. They express concern about the potential contamination of storm water runoff with oil and grease, antifreeze, paint chips, sandblast waste, and other toxic materials, and the effect of storm water runoff on people, fish, wildlife, vegetation, and recreational

---

[17] Sw. Marine, 236 F.3d at 995 (citing Laidlaw, 528 U.S. at 181).

[18] See Docket 60, Exs. A-D.

ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT - 6
3:06-CV-0224-RRB

values as it enters the water table and streams which flow into Resurrection Bay.[19] Since learning about these potential impacts, Declarants have curtailed or ceased their activities and discouraged others from using these areas.

The central basis for the City's argument that Plaintiffs lack standing is that Plaintiffs' briefing and oral argument at the November 20, 2007, hearing focused exclusively on storm water runoff and presented no evidence of contamination as previously alleged in their Complaint. The City argues that Plaintiffs' failure to support allegations of contamination in their Complaint requires dismissal for lack of standing.[20]

This argument, however, is unpersuasive under the current doctrines of CWA standing embraced by the Supreme Court and the Ninth Circuit. In <u>Friends of the Earth v. Laidlaw Environmental Services, Inc.</u>, the Supreme Court announced: "The relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff."[21] The Ninth Circuit has similarly explained that "requiring a plaintiff to demonstrate

---

[19] Two of the Declarants claim to have actually witnessed storm water discharges clouded with sediment and paint chips from the Boat Repair Area in ditches that flow to the creeks and the beaches of Resurrection Bay, Docket 60, Ex. A at 3, ¶ 10 & Ex. B at 3, ¶ 7, although none are aware of scientific studies of the area. <u>See</u> Docket 60, Ex. C at 4, ¶ 15.

[20] Docket 63 at 1-2.

[21] 528 U.S. at 181.

actual environmental harm in order to obtain standing would, in many Clean Water Act lawsuits, compel the plaintiff to prove more to show standing than she would have to prove to succeed on the merits."[22] As discussed below, Plaintiffs' success on the merits is based on demonstrating that the City is responsible for discharges of storm water, contaminated or not. Evidence of contamination, therefore, is not necessary to prevail on the threshold issue of standing.

The Ninth Circuit has held that under Laidlaw "an individual can establish 'injury in fact' by showing a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable – that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction – if the area in question remains or becomes environmentally degraded."[23] Declarants' concerns over storm water discharges are reasonable because storm water is recognized as a significant potential source of pollution.[24] After thoroughly reviewing Plaintiffs' submitted declarations, the Court

---

[22] Ecological Rights Found. v. Pac. Lumber Co., 230 F.3d 1141, 1151 (9th Cir. 2000) (citing Laidlaw, 528 U.S. at 181).

[23] Id. at 1149.

[24] 64 Fed. Reg. 68722, 68724-26 (Dec. 8, 1999); see Natural Res. Def. Council, Inc. v. EPA, 966 F.2d 1292, 1295 & n.3 (9th Cir. 1992).

ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT - 8
3:06-CV-0224-RRB

finds that Plaintiffs have met this standard for demonstrating injury in fact.[25]

There has been no serious dispute that the storm water discharges into Resurrection Bay emanate from the City's Boat Repair Area and Small Boat Harbor. The parties have presented the Court with physical descriptions of the area and the path of storm water runoff through conveyances maintained by the City at the facilities.[26] The Court, therefore, finds that the "injury" discussed above is fairly traceable to the City.

Finally, a "plaintiff who seeks injunctive relief satisfies the requirement of redressability by alleging a continuing violation or the imminence of a future violation of an applicable statute or standard."[27] Plaintiffs at bar seek injunctive and declaratory relief and sufficiently allege the

---

[25] The City's citation of <u>Stanford Ranch, Inc. v. Maryland Cas. Co.</u>, 89 F.3d 618 (9th Cir. 1996) provides scant guidance for the standing issue at bar. While the Ninth Circuit in <u>Standford Ranch</u> briefly recited the general requirements for standing, the case was a contract case, not a citizen suit under the CWA where standing was contested. Moreover, in 2000, the Supreme Court (<u>Laidlaw</u>) and the Ninth Circuit (<u>Pacific Lumber</u>) provided guidance that is more on point.

[26] <u>See</u> Docket 31 at 11-18; Docket 40 at 8-9; Docket 42 at 12-14.

[27] <u>Natural Res. Def. Council v. Sw. Marine, Inc.</u>, 236 F.3d 985, 995 (9th Cir. 2000).

likelihood of continuing violations. Therefore, Plaintiffs have satisfied the redressability requirement for standing.[28]

### B. The City Must Apply for a NPDES Permit

Plaintiffs argue that the Boat Repair Area and the Small Boat Harbor are "industrial facilities" subject to NPDES permits under Section 402(p)(2)(B) of the CWA.[29] Specifically, Plaintiffs assert that the Small Boat Harbor is an industrial facility within Standard Industrial Classification ("SIC") Code 44 which includes marinas and passenger ship docking.[30] Plaintiffs assert that the Boat Repair Area falls within SIC Code 37, which includes ship and boat building and repair activities such as welding, powerwashing, blasting, sanding, and painting.[31] Plaintiffs have submitted evidence of these activities occurring at the Boat Repair Area and Small Boat Harbor.[32] The Court has carefully reviewed the SIC Codes and the documented activities and concludes that the Boat Repair Area and the Small Boat Harbor are industrial facilities under SIC Codes 37 and 44, respectively.

---

[28] See Docket 63 at 10.

[29] 33 U.S.C. § 1324(p)(2)(B).

[30] 40 C.F.R. § 122.26(b)(14)(viii); MSGP § 6.Q, 65 Fed. Reg. 64746, 64841-42.

[31] 40 C.F.R. § 122.26(b)(14)(xi); MSGP § 6.R, 65 Fed. Reg. 64746, 64843.

[32] Docket 31, Ex. A, ¶¶ 6, 26 & 29-31, Ex. C, ¶¶ 8-9, Ex. D (SMIC Policy at 1, attached to Ex. D as Ex. 2), Ex. G at 8-10 & 15, Ex. H at 8-11 & 17.

The above conclusion does not appear to be in dispute. Rather, the City argues that the activities <u>of the City</u> are not "industrial." In other words, the City argues that although it owns the facilities, it is not the "operator" of the facilities.[33] This distinction is significant because under the CWA regulations, "[w]hen a facility or activity is owned by one person but is operated by another person, it is the operator's duty to obtain a permit."[34]

The CWA defines "owner or operator" as "any person owning or operating" a facility.[35] As the parties at bar observe, however, this definition is circular. The parties do not cite, and the Court has not found, any mandatory authority to further guide the Court in deciding whether or not the City is the operator of an industrial facility. Case law outside of the Ninth Circuit "specifically defining 'operator' under the CWA is sparse at best."[36]

Plaintiffs urge the Court to adopt a definition of operator that emphasizes the amount of involvement and control of the City. Plaintiffs point to the EPA's permit applications which

---

[33] Docket 26 at 6.

[34] 40 C.F.R. § 122.21(b).

[35] 33 U.S.C. § 1321(a)(6) (1986).

[36] See <u>Beartooth Alliance v. Crown Butte Mines</u> 904 F. Supp. 1168, 1175 (D. Mont. 1995).

ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT - 11
3:06-CV-0224-RRB

Case 3:06-cv-00224-RRB   Document 66   Filed 02/21/08   Page 11 of 19

explain that "an operator is the 'person responsible for the overall operation of a facility.'"[37] Plaintiffs further rely on a decision of the U.S. District Court for the District of Montana in <u>Beartooth Alliance v. Crown Butte Mines</u>, which set forth a test for deciding operator status under the CWA: "An entity is an operator of a facility where it has power or capacity to (i) make timely discovery of discharges, (ii) direct the activities of persons who control the mechanisms causing the pollution, and (iii) prevent and abate the damage."[38]

Plaintiffs also urge the Court to look to the State of Washington's stormwater discharge permitting scheme which indirectly defines operator. According to the Washington Department of Ecology's Industrial Stormwater General Permit, the entity with "legal authority to manage the facility under the terms and conditions of this permit, including the authority to make capital improvements as necessary" and "day-to-day operational control to assure compliance" is responsible for obtaining the

---

[37] <u>See</u> Docket 42, Ex. A (EPA Form 3510-1, Application Form 1 – General Information, Consolidated Permits Program (1990), at 1-8), Ex. B (EPA Form 351-2F, Application for Permit to Discharge Storm Water Discharges Associated with Industrial Activity (1992)).

[38] 904 F. Supp. at 1175 (citing <u>Apex Oil Co. v. United States</u>, 530 F.2d 1291, 1293 (8th Cir. 1976), <u>cert. denied</u>, 429 U.S. 827 (1976); <u>United States v. Mobil Oil Corp.</u>, 464 F.2d 1124, 1127 (5th Cir. 1972); <u>State of Idaho v. Bunker Hill</u>, 635 F. Supp. 665, 672 (D. Idaho 1986)).

ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT - 12
3:06-CV-0224-RRB

Case 3:06-cv-00224-RRB   Document 66   Filed 02/21/08   Page 12 of 19

permit.[39]  The General Permit further declares: "The owner is the Permittee if they are also the <u>operator</u> of the industrial facility. If the owner and the <u>operator</u> (or tenant) of an industrial facility are not the same, the <u>operator</u> is typically the Permittee and the owner may choose to be a co-Permittee."[40]  Thus, in Washington, an "operator" is the entity with legal authority to manage the facility, make capital improvements, and exert operational control sufficient to assure day-to-day compliance with the terms of the permit.

The City, on the other hand, urges the Court to look to the "ordinary or natural meaning" of the term "operator" as the Supreme Court did in <u>United States v. Best Foods</u> when faced with interpreting that term in the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").[41]  The Supreme Court defined CERCLA's "operator" term as "someone who directs the workings of, manages, or conducts the affairs of a facility. . . . [and] must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the

---

[39]   Industrial Stormwater General Permit, State of Washington Department of Ecology, p. 9, <u>available at</u> http://www.ecy.wa.gov/programs/wq/stormwater/industrial/final%20ISWGP%20Permit%20modification%20after%20comment.pdf.

[40]   <u>Id.</u> (emphasis added).

[41]   524 U.S. 51, 66 (1998).

ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT - 13
3:06-CV-0224-RRB

leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."[42]

The City also relies on the Alaska Supreme Court's decision in Parks Hiway Enterprises, LLC v. CEM Leasing, Inc., which cited Bestfoods in interpreting Alaska's strict liability hazardous substances statute to mean someone involved in running the facility "typically on a day-to-day managerial basis."[43]

Neither Best Foods, nor Parks Hiway, however, involved interpretation of the CWA. In other cases cited by the City which do involve the CWA, the identity of the operator was not in dispute.[44] Rather, these cases simply restate the owner/operator distinction set forth in EPA regulations.[45]

More importantly, the Court need not reconcile these various standards. Whether under Beartooth Alliance or Best Foods, the Court finds that the City retains sufficient involvement in, and control of, both the SMIC Boat Repair Area and the Small Boat Harbor. Plaintiffs have presented evidence of the City's

---

[42] Id. at 66-67.

[43] 995 P.2d 657, 662-63 (Alaska 2000) (interpreting Alaska Stat. § 46.03.822).

[44] See Newton County Wildlife Ass'n v. Rogers, 114 F.3d 803, 810 (8th Cir. 1998); Sierra Club v. Martin, 71 F. Supp.2d 1268, 1304 n.5 (N.D. Ga. 1996); Sun Co., Inc. (R&M) v. Penn. Turnpike Comm'n, 708 A.2d 875, 880 (Pa. Cmwlth. 1998).

[45] See 40 C.F.R. § 122.21(b) ("When a facility or activity is owned by one person but is operated by another person, it is the operator's duty to obtain a permit.").

ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT - 14
3:06-CV-0224-RRB

activities at the facilities, which include: snow removal, steaming ditches and culverts to facilitate flow of storm water, cleaning up and disposing of residual water, such as oil, and hauling boats to and from the facilities.[46]

It further appears that the City is the only entity that possesses control over the facilities in question.[47] Certainly the individual boat owners do not for they lack the authority over, and knowledge of, the facilities needed to submit NPDES permit applications.[48] Moreover, without sufficient involvement and control over drainage, outfall improvements, materials storage, and disposal areas, individual boat owners lack the authority and knowledge needed to implement storm water prevention plans and best management practices.[49]

The City's arguments that it cannot be held strictly liable for discharges of third parties (i.e., individual boat owners), or that the enactment and enforcement of harbor regulations are discretionary municipal functions within the scope of governmental immunity, miss the mark.[50] Plaintiffs neither seek to hold the City liable for third party boat owners' conduct, nor

---

[46] Docket 31, Ex. G at 4-5, 8, 11-15, Ex. H at 4-12, 16.

[47] Docket 42 at 8.

[48] Id. at 9.

[49] Id.

[50] Docket 38 at 6-11.

ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT - 15
3:06-CV-0224-RRB

for enacting and enforcing harbor regulations. Rather, the issue, as discussed at length above, is whether the City is the operator for purposes of the CWA.

Finally, the City's argument the Multi-Sector General Permit ("MSGP") which expired in October 2005 and has not yet been renewed is unavailing.[51] Expiration of the MSGP does not relieve a discharger of storm water from the obligation of obtaining an individual storm water discharge permit. The EPA regulations require industrial storm water dischargers to obtain individual NPDES storm water permits in the absence of an applicable general permit.[52] Further, the EPA encourages facilities that did not receive coverage under the MSGP to implement and develop storm water pollution plans pursuant to the MSGP until such time as the MSGP is reissued.[53]

The Court finds that, for purposes of the CWA, the City is an operator of industrial facilities which discharge storm water into waters of the United States. Accordingly, the City is required to apply for an NPDES permit.

---

[51] See Docket 26 at 12 & Ex. E; Docket 38 at 21-23.

[52] 40 C.F.R. § 122.26(c)(1)("Dischargers of storm water associated with industrial activity and with small construction activity are required to apply for an individual permit or seek coverage under a promulgated storm water general permit.").

[53] See Docket 26, Ex. B.

## C. The Court Declines to Award Civil Fines

Section 309(g)(3) of the CWA authorizes the Court to assess civil penalties up to $25,000 per day per violation. In determining the amount of penalties, if any, the Court will consider: (1) the seriousness of the violation; (2) if, and how much economic benefit the violator gained from the violation; (3) if the violator has violated the CWA in the past; (4) if the violator showed any effort to comply with the enforcement action brought upon it by the citizen suit; and (5) how much of an economic impact the civil penalty will have on the violator.[54]

After considering these factors in the context of this case, the Court concludes that civil penalties are not appropriate. Evidence of actual pollution is not overwhelming and the EPA has not determined that the City needs a permit. Although these facts do not negate Plaintiffs' standing, they lessen the seriousness of any violation. Similarly, there is no evidence regarding economic benefit, or of past violations beyond Plaintiffs' tally of violations in this suit.[55] To the City's credit, it has sought an opinion from the EPA and taken steps to obtain the General Permit which is no longer available. The City, although technically required to have a NPDES permit, could not have reasonably

---

[54] 33 U.S.C. 1319(g).

[55] See Docket 31 at 24-25.

understood this to be the case. Further, the City appears to have long acted conscientiously in maintaining these facilities.

Moreover, Plaintiffs' requested penalties would have a severe economic impact on the City. This impact is undeserved in light of evidence that the City has a reputation for having management practices which exceed most Alaskan harbors[56] and that no similar harbor in Alaska has an NPDES permit.

Finally, it must been noted that although caution and legitimate concern for the environment justify the permitting process mandated by the Clean Water Act, it was not intended to prohibit responsible use of the resource or to make such use cost prohibitive. Plaintiffs' request for civil penalties is therefore denied.

## V.  CONCLUSION

Plaintiffs' Motion for Summary Judgment at Docket 23 is hereby **GRANTED IN PART** and **DENIED IN PART** consistent with the text of this Order. The City's Motion for Summary Judgment at Docket 25 is **DENIED**.

The City shall proceed in due course to apply for an NPDES permit and shall begin such efforts within 90 days hereof.

---

[56]  See Docket 28 at 3, ¶ 13.

ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT - 18
3:06-CV-0224-RRB

Final Judgment shall enter consistent herewith with each party to bear its own costs and fees.

**IT IS SO ORDERED.**

ENTERED this 21st day of February, 2008.

                                           s/RALPH R. BEISTLINE
                                           UNITED STATES DISTRICT JUDGE